JOHN E. BOYD AND P. COLSON PERRY, *Plaintiffs in Error,*
v. E. O. PAINTER FERTILIZER COMPANY, A CORPORATION,
*Defendant in Error.*

Opinion Filed March 23, 1922.

Petition for Rehearing Denied May 3, 1922.

1. Where testimony is offered in evidence that will have a
   tendency to relieve a party to a suit of the imputation of
   wrongdoing, of a character, which, though not material to
   the issue, would have a tendency to prejudice the jury
   against him, it is reversible error to exclude it.

2. In a suit for professional services which terminated on a
   given date, it is reversible error to permit the introduction
   of a letter written thereafter, relating solely to an offer to
   render future services where such letter contains matter
   that would have a tendency to prejudice the jury against the
   writer, and serve no purpose in throwing light on the mat-
   ters in litigation.

3. If reasonable men may differ as to the existence of facts
   establishing an ultimate fact, or as to inferences to be drawn
   from conceded facts, the case should be submitted to the
   jury.

A Writ of Error to the Circuit Court for Duval County;
Daniel A. Simmons, Judge.

Judgment reversed.

*George M. Powell,* for Plaintiffs in Error;

*Williams & Bly, for* Defendant in Error.

BROWNE, C. J.—This is an action by Doctors John E. Boyd and P. Colson Perry against the E. O. Painter Fertilizer Company to recover $5,600.00 for professional services as physicians and surgeons incident to the death of E. O. Painter, the president of the defendant company, alleged to have been done and rendered by them for the defendant at its request.

The items for which compensation is claimed, are thus set out in the bill of particulars: "Attending and performing autopsy upon the remains of E. O. Painter, $1,000.00; office advice, conference and consultations from May 22, 1913, to June 16, 1913, and from June 25, 1913, to July 1, 1913, $1,000.00; services as per agreement during absence on second trip to Baltimore and trip to New York from June 16, to June 25, 1913 (nine days at four hundred ($400.00) dollars per day), $3,600.00."

. The case went to trial on issues joined by a plea of "never was indebted as alleged."

The court charged the jury "that as to the item of one thousand dollars for performing an autopsy on the body of Mr. E. O. Painter, deceased, the plaintiffs have failed to make a case as to that particular item," and that "there is no testimony that warrants me in submitting the question to you," but submitted to the jury the question of whether or not there was any liabiliy on the part of the defendant corporation, for the second trip made by the plaintiffs to Baltimore and New York. and for the office advice, conferences and consultations between the plaintiffs and certain officers of the defendant corporation.

The trial resulted in a verdict for the defendant, and the cause is here on writ of error from the order of the court denying a motion for a new trial.

The evidence discloses that E. O. Painter, then President of the E. O. Painter Fertilizer Company, was drowned in the St. Johns River on May 22, 1913, and his dead body was recovered about 2 o'clock of the afternoon of the same day and taken to an undertaker's establishment.

Dr. Perry had been communicated with by telephone in the morning by Mr. Lyman, cashier and bookkeeper of the E. O. Painter Fertilizer Company, and requested to remain in his office to be called on the finding of the body of Mr. Painter to see if it could be resuscitated.

Dr. Boyd was communicated with by telephone between 1 and 2 o'clock in the afternoon, and informed that the body of Mr. Painter had been recovered, and asked to go to the undertaking establishment where the body had been taken to see if it could be resuscitated. Dr. Perry was at the undertaking establishment when Mr. Painter's body was brought, and Dr. Boyd came in in a very short time afterwards. Mr. Morrison, Secretary of the E. O. Painter Fertilizer Company, and Mr. Lyman, Cashier of the Company, were also present.

After examining the body and ascertaining about how long it had been in the water, the doctors decided that resuscitation was impossible. While there, the doctors learned that Mr. Painter carried a very large amount of life insurance, and that the E. O. Painter Fertilizer Company, of which he was president, was one of the beneficiaries to the extent of about $150,000.00. It was then suggested that an autopsy be held for the purpose of establishing, if such was the fact, that Mr. Painter came to his death from natural causes.

Explaining the reason for the autopsy, Dr. Perry testified: "The instructions received by us comprehended the

suggestion that apparent reasons for the determination of the cause of death, was due to rumors on the street at the time of Mr. Painter's death, and preceding the finding of his body. Statements were made to me showing that the interest the company had in the autopsy was to determine whether Mr. Painter had taken any poison that might cause death, other than that of drowning, because of the amount of money involved in the insurance, namely, a million two hundred thousand dollars. They told me the interest of the company was a hundred and fifty thousand dollars.''

The autopsy took approximately two and a half hours, during which time, ''The entire body of Mr. Painter was inspected; skull opened, brain removed, heart, lungs, liver, kidneys and the organs contained within the abdomen, placed within a vessel for proper keeping,'' and these parts were shipped that night to experts in Baltimore for chemical analysis ''to determine whether there was the presence of a poison in the system; if not, the cause of his death.''

Doctors Perry and Boyd testify that they were authorized by Mr. Morrison, Secretary of the E. O. Painter Company, to perform the autopsy, but notwithstanding this, they did not proceed until the consent of the family was obtained.

Doctor Boyd testified that Mr. Lyman stated, ''I am authorized to say, go ahead with the autopsy. But if you want further confirmation, why, we will get it.'' Dr. Perry testified that Mr. Morrison, Miss Painter and Mr. Lyman gave their consent to the autopsy, and upon request, Mr. Lyman furnished a written authority which was given to Mr. Kyle,'' and that acting upon that authority Dr. Boyd and he performed the autopsy.

After the autopsy the doctors went to the office of the E. O. Painter Fertilizer Company and there met Mr. Morrison, Mr. Lyman and other members of the company. On the following morning they met Mr. Conrad, who was elected president of the fertilizer company on that day, Mr. Morrison, Mr. Lyman and Mr. Hamlin, general attorney for the E. O. Painter Fertilizer Company. Conferences were held between members of the E. O. Painter Fertilizer Company on the day after the autopsy, and after the parts that had been removed from Mr. Painter's body and sent to Baltimore for examination. Doctors Perry and Boyd left on the afternoon of the 23rd of May, for Baltimore. This trip was made at the instance of officers of the E. O. Painter Fertilizer Company, and the Doctors expenses and their bill for services in going to Baltimore and being present there during all the time the examination of the parts of Mr. Painter's body were being made by the experts, were paid by checks of the E. O. Painter Fertilizer Company.

From the 7th of June, when the Doctors returned from Baltimore until the 15th of June, they were in daily conference with members of the E. O. Painter Fertilizer Company which lasted from a few minutes to as much as practically all day.

It appears from the testimony that the day after the autopsy was performed and parts of the body of Mr. Painter removed and sent to experts in Baltimore for chemical analysis and pathological examination, Doctors Perry and Boyd were sent there to remain while the specialists made the examinations, and their expenses, and their services while so engaged, were paid for by the E. O. Painter Fertilizer Company.

. These facts and circumstances in connection with other evidence raised an issue as to whether there was any liability of the E. O. Painter Fertilizer Company to pay for the services in performing the autopsy, by reason of the authority that Doctors Perry and Boyd testified had been given them by the secretary of the corporation, and denied by him, or if the company by its subsequent acts ratified the alleged acts of its secretary in this matter, and what if anything was a reasonable compensation for such services, which we think should have been submitted to the jury for determination.

During the progress of the trial the plaintiffs offered in evidence the written authority from Miss Okle Painter, the daughter of the deceased, dated May 22, 1913, ''to hold an autopsy on the body of E. O. Painter, and to remove such specimens as they may see fit for pathological examination.''

The purpose of introducing this document in evidence was not to establish the liability of the E. O. Painter Fertilizer Company, but to show that the Doctors did not mutilate the body of Mr. Painter without authority from his wife and only child, who alone could give such authority.

The E. O. Painter Fertilizer Company could obligate itself to pay for the Doctors' services in performing the autopsy, but it could not authorize them to mutilate the body. To do this the Doctors needed authority from the family.

It was to relieve themselves from an imputation of having mutilated the body without such authority, which might have had some effect in prejudicing the jury against the plaintiffs, that this document was offered in evidence,

and it was proper for this purpose, and the court erred in excluding it.

The 9th ground of the motion for a new trial relates to the admission in evidence over the objection of plaintiffs of a letter dated July 7, 1913, from the plaintiffs to Miss Okle Painter, containing a proposition to render future professional services as experts in her behalf, in the case of litigation over the insurance policies.

The amount charged, the character of the proposition and the tone of the letter, would have a tendency to create a feeling of hostility against the writers, and served no purpose in throwing light on antecedent circumstances.

The services for which the plaintiffs were suing terminated on the 1st of July, 1913. The letter was written on July 7th. It was a proposition of employment for future services. The letter states, "This proposition includes every necessary service on our part from now until your case is ended." The only reference to the past was, that as one of the conditions for their accepting the new employment, that all bills then due should be paid in full. The offer was not accepted, and as it shed no light on the past transactions that were the subject of the lawsuit, it was not only irrelevant and immaterial, but had a tendency to prejudice the jury against the plaintiffs.

The court erred in admitting this letter in evidence, and the error was injurious to the plaintiffs.

For the errors indicated, the judgment is reversed.

TAYLOR, WHITFIELD, ELLIS AND WEST, J. J., concur.